

FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

97 FEB -7 PM 3: 56

U.S. DISTRICT COURT
N.D. OF ALABAMA

In the Matter of:                )
                                 )      Case No:
BBL GROUP, INC.,                 )      CV-96-AR-3309-E
                                 )
        Debtor.                  )      Bankruptcy Case No:  *Cko*
                                 )      95-42424
                                 )      (Jointly administered
BENJAMIN B. LOFTON,              )       with 95-42423)
                                 )
        Debtor.                  )
                                 )

# ENTERED

## MEMORANDUM OPINION

FEB 7 1997,

Benjamin Lofton ("Lofton") and BBL Group, Inc., ("BBL")
(collectively "debtors") a company wholly owned by Lofton, appeal
from the bankruptcy court's approval of a § 1123 plan by creditor
Talent Tree Staffing, Inc. ("Talent Tree"). BBL and Lofton attack
the plan on numerous grounds. Each assault primarily centers on
the bankruptcy judge's acceptance of a § 1123(b)(3)(A) settlement
or adjustment of BBL and Lofton's underlying fraud and conspiracy
claims against Talent Tree and Donald Harris ("Harris"). Debtors
contend that if they had been allowed to proceed with their
adversary proceeding and had prevailed on the merits of their
claim, they would be able to pay all their creditors without the
aid of Chapter 11. Each of debtors' arguments will be addressed in

1

turn.

### A. Pertinent Facts

This court accepts the facts as set forth in the bankruptcy court's September 20, 1996, order of confirmation in the above-styled Chapter 11 bankruptcy. However it is necessary to briefly set forth the essential facts of this complex situation. Talent Tree is a corporation that provided payroll services to a nonprofit entity, Psychiatric Care Day Hospital Center & Clinics ("Hospital"). The Hospital was formed and operated by Barbara Lofton, Ben Lofton's wife. Not only did Lofton's wife receive a $300,000.00 per year income from Hospital, but Lofton formed a company, Psychiatric Evaluation and Rehabilitative Services, Inc., that was to provide consulting services to Hospital. The extent of services provided are unknown, though Lofton admits to providing some consultation to his wife regarding Hospital, though he claims he was not compensated.

BBL, a corporation wholly owned by Lofton, has as its primary assets a Maryland lottery ticket and a cattle farm located in St. Clair County, Alabama, where Lofton lives. BBL's primary and apparently only business was that of cattle farming. BBL borrowed money from Hospital in 1993, when it could not pay for Lofton's consulting services that he had offered to BBL. Both Lofton and,

2

through him, BBL enjoyed the use of Barbara Lofton's Hospital income.

The bankruptcy court entered sanctions against BBL and Lofton for failing to comply with a discovery request. The sanctions took the form of establishing the following facts: (a) Lofton was actively and intimately involved in the operation of Hospital; (b) Barbara Lofton had no assets other than her $300,000.00, and she cashed her paychecks and maintained no bank account in order to avoid creditors; (c) the consulting services and business owned by Lofton were valuable only if Hospital remained in operation; (d) from 1993 through March 1995 BBL received material financial benefit from Hospital revenues and extensions of credit by Talent Tree; (e) in November 1994, when loan documents were executed in favor of Hospital by Talent tree, Hospital was pursuing a sale of programs and possessed claims to approximately $3,000,000.00 in funds that had been suspended pending a federal criminal investigation. Had the sale occurred or the funds released, Lofton and BBL would have derived a substantial and material financial benefit in excess of the amount of Talent Tree's debt that was guaranteed by Lofton and BBL.

By October 1994, Hospital owed Talent Tree over $1,000,000.00. In order for Talent Tree to continue extending credit, it required

3

some form of guarantee that the past and future loans would be paid.  BBL and Lofton thereupon executed such guarantees, and additional money was advanced by Talent Tree in order to pay Hospital employees.  BBL and Lofton claim that Don Harris ("Harris"), their lawyer and the Hospital's lawyer, fraudulently induced Lofton to sign the guarantee agreements.  Further they argue that Talent Tree, where Harris' wife worked, conspired with Harris to defraud BBL and Lofton.  Talent Tree was able to procure default judgments against Barbara Lofton and Hospital for monies owed, and sought to collect from Lofton and BBL per their guarantees.  BBL involuntarily filed for Chapter 11 bankruptcy and Lofton voluntarily filed for Chapter 7.  These proceedings were eventually combined creating a forum in which the present controversy could be litigated.

### B. Standard of Review

This appeal presents questions of law and fact.  A bankruptcy court's conclusions of law are subject to *de novo* review by the district court.  *See In re G.S.F. Corp.*, 938 F.2d 1467 (1st Cir. 1991); *In re Daniels-Head & Assocs.*, 819 F.2d 914 (9th Cir. 1987). A bankruptcy court's findings of fact are reversed only upon a showing of clear error.

4

### C. Legal Analysis

### 1. Sanctions

BBL contends that the sanctions imposed by the bankruptcy court against BBL and Lofton are unreasonable and unsupported as a matter of law.  The sanctions are not unreasonable.  Lofton and his probable alter-ego BBL have apparently been routinely uncooperative and have attempted to hinder the resolution of the bankruptcy through their silence, evasion of discovery, and their adversary proceedings which lack substantial merit.  Given the foreseeable outcome of the bankruptcy one can perhaps understand why debtors engaged in such tactics, but delaying the inevitable does not warrant non-compliance with legitimate discovery requests.  Lofton claims to have suffered a stroke and that this excuses his non-compliance.  Under ordinary circumstances it may have, but the bankruptcy judge is significantly more familiar with this case than is this court and knows the history of Lofton's and BBL's non-compliance and non-cooperation.  That court is in a better position to decide whether past acts by debtors warranted the sanctions.

Lofton and BBL apparently "violated [the bankruptcy court's] discovery order of May 22, 1996 and [did] not produce[] numerous material documents that Lofton testified existed and were in his possession." (Bankruptcy Ct. Opinion ¶ 49).  In the bankruptcy

proceeding, the judge purportedly acted pursuant to Rule 7037(b)(2)(a) and "sanction[ed] BBL in the form of facts as established pursuant to Rule 7037(b)(2)(a)." (Bankruptcy Ct. Opinion ¶ 50). The facts "deemed entered" were seemingly critical in establishing a common link between Lofton, his wife, Hospital, BBL, and Talent Tree, that allowed the BBL/Lofton guarantee of the Talent Tree loan to be considered a non-fraudulent transfer. *See* discussion *infra*. BBL argues that because the discovery request was not made under the auspices of an adversary proceeding, and was not issued in the form of a subpoena it is invalid. This court disagrees.

It is true, as BBL asserts, that Rule 7037(b)(2)(a) expressly applies to "adversary proceedings." Part VII of the bankruptcy rules, in which Rule 7037 appears, is entitled "adversary proceedings" and does not purport to cover discovery disputes in the predominant bankruptcy proceeding. The May 22, 1996, discovery order was issued in the context of the Bankruptcy Case Number 95-42423 (Jointly Administered with 95-42424) and not in the context of any adversary proceeding. What BBL does not discuss, and neither unfortunately does Talent Tree, is that Rule 7037, along with Rules 7021, 7025, 7026, 7028-7037, 7041, 7042, 7052, 7054-

6

7056, 7062, 7064, 7069, and 7071, applies in "contested matters."
*See* Rule 9014 Bankruptcy Rules.  Among other things, objections to
a confirmation plan and the use of cash collateral are contested
matters that expressly reference Rule 9014. *See* Rule 3020(b)(1) and
Rule 4001(a).

Rule 2004 is the appropriate route for discovery requests and
orders at the initial stages of a bankruptcy hearing.  The
distinctions between bankruptcy discovery and the discovery in
adversary proceedings are evident.

> The range of discoverable subject matter in a Rule 2004
> examination is "unfettered and broad." As such, it does
> not offer the procedural safeguards available under the
> Federal Rules of Civil Procedure made applicable to
> discovery under Rule 9014. . . .  Without nay limiting
> principles on the use of Rule 2004 as a discovery tool,
> Rule 9014, adopting the Federal Rules of Civil Procedure
> for conducting discovery in contested bankruptcy matters,
> would be rendered superfluous.  Two limiting principles
> on the Rule's application can be gleaned from the case
> law: (1) a Rule 2004 examination is utilized for the
> purpose of identifying the assets and transactions
> involving a debtor's estate; and (2) it is generally used
> as a prelitigation device, curing the short time period
> before the matter becomes contested.

*In re Dinubilo,* 177 B.R. 932, 939-40 (E.D. Ca. 1993).  Once the
bankruptcy evolves beyond its primordial stages, and certain plans
are objected to, use of cash collateral is contested, or other
similar disputes arise, use of Rule 9014 and the Federal Discovery

Rules are appropriate. A matter apparently is contested "whenever there is an actual dispute, other than an adversary proceeding, before the bankruptcy court, the litigation to resolve that dispute is a contested matter." *Id.* at 941 n.15 (citing Advisory Committee note on Rule 9014).

It is unclear to this court in what manner the May 22, 1996, discovery order arose though it appears to have arisen in the context of a challenge to Talent Tree's proposed plan of reorganization filed March 3, 1996. On May 7, 1996, BBL filed an objection to Talent Trees's May 22, 1996, disclosure statement that accompanied its proposed plan. In paragraph four of that objection BBL stated "the disclosure statement does not adequately disclose that the alleged debt and transfer to Talent Tree is fraudulent and may be avoided by the debtor pursuant to § 544, § 547, and § 548." The discovery requested the next day, May 8, 1996, by Talent Tree relates to evidence needed by Talent Tree to meet BBL's objections in this contested matter. Because the discovery request was made in the context of a contested matter, then the sanctions were legally permissible pursuant to Rule 7037. There is not contention by BBL or Lofton that the discovery request contained any other defects, therefore the facts that BBL and Lofton failed to submit were appropriately deemed admitted.

8

## 2. § 1123(b)(3)(A)

The court now turns to the crux of BBL's objections. The pertinent statute, i.e. 11 U.S.C. § 1123(b), contains permissible, not mandatory, provisions of reorganization plans. That section provides that "[s]ubject to subsection (a) of this section, a plan may . . . (3) provide for--(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate . . . ." This provision allows bankruptcy courts to determine the actual worth of the debtor estate, including its claim assets, in order to adequately value the estate and reimburse creditors. "The valuation of the assets of a debtor in bankruptcy, including causes of action held by the debtor, is an integral part of the confirmation process under Chapter 11." *In the Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1165 (5th Cir. 1988), *cert. denied*, 488 U.S. 426, 109 S. Ct. 311 (1988). BBL argues that neither it nor Lofton consented to or negotiated any part of the "settlement or adjustment." Therefore, it is argued, Talent Tree's proposed plan includes no "settlement or adjustment" of debtors' adversary proceedings for the bankruptcy judge to consider.

BBL suggests the following argument which this court finds intriguing. BBL claims that the terms "settlement" and "adjustment" are terms which evoke images of agreement or

9

compromise among two parties, as indeed they generally do. A law suit is "settled" when the parties agree to its resolution mutually. BBL contends that because Lofton, neither individually or for BBL, agreed or compromised, there has been no settlement or adjustment.   BBL, citing *Ballentine's Law Dictionary* correctly points out that settlement means "the ending of a controversy by agreement" and that adjustment means "to settle or to bring to a satisfactory state, so that the parties are agreed in the result." However, the court, after pulling its own dictionaries off the shelf, found that the words "settlement" and "adjustment" include not just mutually agreed upon compromises but also unilateral proposals of finality.  Black's Law Dictionary defines settlement not only as bringing to finality by agreement or compromise, but also as an "[a]ct or process of adjusting or determining . . . payment or satisfaction . . . [t]o fix or resolve conclusively[,] [or] to make or arrange for final disposition." Black's Law Dictionary (5th ed. 1979).  Each of these separate acts requires only one actor. Webster similarly defines settlement as an "agreement composing differences", but also, among other things, defines the term as "an act of bestowing or giving possession under legal sanction" and as "the act or process of settling."  In turn the verb "settle" means "to make quiet or orderly", "to fix or

resolve conclusively", "to establish or secure permanently", "to arrange a desired position", "to become fixed, resolved or established", and "to adjust difference or accounts." Webster's Ninth New Collegiate Dictionary (1991). A synonym of "settle", is "decide". *Id.* None of these acts require consensus. Because the term "settle" can encompass a unilateral proposal, the court finds does that settlement of the Lofton and BBL adversary proceedings does not require BBL's or Lofton's consent nor does it require negotiation.

Furthermore, the sparse case law interpreting § 1123(b)(3)(A) does not recognize that such negotiations between the creditor/defendant and debtor/plaintiff over terms of the "settlement or adjustment" is a requirement of § 1123(b)(3)(A). On the contrary arms-length bargaining, indeed any bargaining at all, is merely one factor that a court may consider. The bankruptcy court in *In re Cellular Information Systems*, 171 B.R. 926, 947 (Bankr. S.D.N.Y. 1994), upon which the bankruptcy judge in the present controversy heavily relied, recognized:

> The Debtors argue that the Banks have not proposed a settlement because the "Banks'(sic) seek to agree with themselves as to what their liability should be." . . . The Debtors correctly note that the proposed disposition and adjustment of the Lender Liability Suit, an asset of CIS and CIS-CIS-1's respective estates, is not the

11

product of arms length negotiations between the
Plaintiffs and the Banks. This, however, in no way bars
consideration of the proposed settlement.

First . . . the settlement results from negotiations
and discussions with Committee Counsel and is supported
by the Committee. Second, the Code expressly provides
that a plan proponent may propose a settlement of any
claim held by the estate.

Debtors argue that unlike the situation of *In re Cellular Phones,*
there was absolutely no negotiation or discussion of the settlement
either among the various creditors or among the creditors and the
debtors. The court recognizes that one factor a bankruptcy court
might consider in approving a "settlement or adjustment" is the
"extent to which the settlement is the product of arm's-length
bargaining." *Id.* at 948 (citing *In re Drexel Burnahm Lambart Group,
Inc.,* 138 B.R. 723, 758 (Bankr. S.D.N.Y. 1992)). Other factors
that the court might consider in determining if a proposed
settlement is reasonable include: (1) the probability of success on
the merits; (2) the difficulties that may be encountered in the
collection; (3) the complexity of the litigation and the attendant
experience and inconvenience of delay; (4) the paramount interests
of the creditors; (5) degree to which the settlement is supported
by the parties in interest, (6) the competency and experience of
counsel who support the settlement; and (7) the relative benefits

12

to be received by members of any affected class. *Id.* (citing cases).

This "settlement" was not a product of arms-length bargaining among the party litigants. It was not an agreement at all. It was only an adoption of the settlement for the benefit of the creditors and not the debtors. However, this is not impermissible. *See In re Cellular Information Systems,* 171 B.R. at 947 (comparing *In re Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1988), where the Fifth Circuit approved a plan proposed by a lawsuit defendant and unsecured creditors and the Chapter 11 trustee). The bankruptcy court understood that the creditors alone approved the planned settlement, and that Lofton as the sole member of a class representing the equity holder's interest in BBL, objected. Even so, the court found that other factors, discussed *infra,* weighed in favor of approving the settlement. "While a Court may consider the objections of parties in interest who oppose a proposed settlement such objections are certainly not controlling." *In re Drexel Burnham Lambert Group, Inc.* 138 B.R. 723, 758-59 (Bankr. S.D.N.Y. 1992). Because the settlement of claims did not require either BBL or Lofton's input and because the bankruptcy court recognized the settlement was not a product of arms-length bargaining and weighed

13

that against other relevant factors, this court finds no error by the bankruptcy court on this issue.

The bankruptcy court, of course has an obligation to ensure, utilizing some of the various tests set forth above in making that determination that the plan settlement or adjustment is of a related adversary proceeding is "fair and equitable." *Protective Committee for the Independent Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. 414, 424, 88 S. Ct. 1157, 1163 (1968). In making this determination the bankruptcy court need not conduct a "mini trial" on the merits of the underlying action. *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 759. Rather, the bankruptcy court merely needs to "canvass the issues [to] see whether the settlement fall[s] below the lowest point in the range of reasonableness." *Id.* (internal citations and quotation marks omitted). In the present case, the bankruptcy judge adopted the four step approach of *In re Cellular Information Systems* to make a fairness determination. These four steps included: (1) probability of success in the litigation; (2) the difficulties of collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors and a proper deference to their

14

reasonable views in the premises, have been adopted by the Eleventh
Circuit. *See In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th
Cir. 1990)(citing cases), *cert. denied,* 498 U.S. 959, 111 S. Ct.
387 (1990); *see also In the Matter of Andreuccetti,* 975 F.2d 413,
421 (7th Cir. 1992). The court undertook a review of the entire
record and determined that a full trial on the merits was not
necessary to approve the settlement. These factors upon which the
court relied will be addressed in turn.

### (a) Probability of Success on the Merits

BBL asserts that the bankruptcy court applied the incorrect
legal principles in determining the probability of success of BBL
and Lofton's adversary proceedings.   BBL claims that Lofton,
individually and as decision maker for BBL, was fraudulently
induced by Don Harris and Talent Tree into guaranteeing a Talent
Tree loan to Hospital. It is this guarantee which constitutes BBL's
primary liability. Lofton did not read the guarantee agreements he
signed for himself and BBL.  Nevertheless, BBL asserts that Lofton
had no duty to read agreement because he permissibly relied on his
lawyer Harris to describe the contents of the guarantee agreements.
Harris allegedly told Lofton that the agreements would neither
encumber Lofton's personal assets, nor the assets of BBL.

The bankruptcy court determined the probability of BBL and Lofton's success on their fraud claim was negligible. In making this determination, the bankruptcy court noted the well established doctrine that a signatory to an agreement is deemed to understand the contents of that agreement. *See Alfa Mutual Ins. Co. v. Northington,* 561 So. 2d 1041 (Ala. 1990).

> [A]s a matter of law, a person with the ability to read and to understand the nature of the transaction cannot act on an oral representation when that representation is followed by an executed document that contradicts it.

*Id.* at 1046.  Conceding the general rule, BBL contends that a signatory may be excused from reading a document when that document is prepared by a fiduciary, i.e. an attorney. *See id.* at 1049 (denying application for rehearing))(Houston, J., concurring specially). The court notes that this exception is not so clearly established as is the general rule, but the court recognizes its allure.  Persons should be encouraged to rely on a fiduciary's representations.  If this were not so encouraged, substantial inefficiencies would arise.  For instance, individuals conducting business would be compelled to get law degrees because they would not be permitted to trust their counsel's representations.  The fiduciary exception, however, cannot act as an absolute liability shield where the signatory actually knows or should know of a

16

document's contents.

In this case, the bankruptcy court determined that even if Don Harris falsely represented the contents of the guarantee, that Lofton, for himself and BBL, "must have closed his eyes to avoid the discovery of the truth because the alleged misrepresentation was so contradictory to the terms and provisions of the [guarantee agreement] that a person with [Lofton's] education and experience should have known the truth." *Boland v. Fort Rucker Nat. Bank*, 599 So. 2d 595, 599 (Ala. 1992). Sufficient evidence exists to support this determination. Lofton had experience as a business person, had two years of legal training, and most significantly he had borrowed money on other occasions and had executed promissory notes and mortgages. The representations by Harris, even if they were fraudulent, could not have been reasonably relied upon by Lofton. The circumstances surrounding the transaction indicate that Lofton was aware of the fact that Talent Tree needed a significant guarantee for all of Hospital's debt to Talent Tree in order to advance any future funds. By signing the guarantee he obviously knew that his assets and BBL's could be encumbered. He and BBL protest now that their marker has been called.

Substantial evidence exists that Lofton knew such a guarantee would encumber his assets. Harris told Lofton's wife, Barbara

17

Lofton, who had legally refused to testify on this matter by invoking her Fifth Amendment rights, that personal guarantees were needed in order for Talent Tree to continue advancing Hospital money. Barbara Lofton had originally incorporated Hospital as a non-profit entity. That entity provided her with $300,000 per year salary and it provided Lofton's consulting business a ready and willing client. The documents that Lofton signed were all entitled either "Guaranty" or "Security Agreement." This would have lead a reasonable person, especially one with legal training, to believe that he was guaranteeing a loan, and not merely giving a statement of assets, as Lofton contends he believed. Furthermore, Lofton signed a one page UCC-1 Form to perfect the Talent Tree security interest, that was an obvious security instrument. Finally, Lofton's testimony tends to indicate that he understood that his guarantee was necessary for Talent Tree to advance any more money to the Hospital, and that in the event of the failure of the Hospital to pay the money he would be obligated to "sit down with Talent Tree and . . . work out a payment schedule." Given this overwhelming evidence, the court cannot conclude that the bankruptcy judge was erroneous in concluding that Lofton and BBL "failed to show any material misrepresentation because reliance was unjustified as a mater of law."

18

## (b) Difficulty in Collection

The bankruptcy court determined that there would be little difficulty in collection. This determination was not challenged.

## (c) Complexity of Litigation and the Attendant Expense, Inconvenience and Delay

The bankruptcy court determined that while significant discovery had occurred through both the bankruptcy proceeding and the adversary and state court proceedings, the refusal of key witnesses to testify coupled with other factors would lead to significant delay in concluding the adversary proceeding. These delays would cause the creditors to incur additional expense and would postpone the reorganization indefinitely. The court finds no error in this determination. Likewise, debtors do not contest it.

## (d) Paramount Interest of the Creditors

The bankruptcy court noted that all of the creditors unanimously approved the plan. Only Lofton's equity interest opposed it. It is evident that the creditors would prefer the plan to go forward and, as noted above, they would be unnecessarily prejudiced by any delay in confirming the plan.

## (e) Remaining Factors

BBL opines at some length that the bankruptcy judge erred in not considering other factors in determining whether the Talent

19

Tree plan was indeed fair and equitable.  BBL claims that the bankruptcy judge erred in: (1) not considering a range of possible outcomes of the disputed litigation; (2) failing to take into account the interest of the creditors; (3) erroneously finding that BBL had not conducted discovery in its adversary proceeding; (4) not considering prior settlement negotiations; (5) not considering whether the  settlement was one of arms length bargaining; and (6) not determining the range of settlement. While BBL thankfully stopped its list here, the court is positive that these requirements could go on *ad infinitum*, thus infinitely prolonging a final "fairness" determination in any bankruptcy.

To be sure, some of these considerations are important, but they are merely additional considerations that may or may not sway a fairness or reasonableness determination. This is especially true where all of the other factors warrant court approval of a plan. BBL's complaints about arms-length bargaining and interest of the creditors have been addressed above and will not be reiterated here.  BBL's contentions that the court did not consider all possible outcomes of the disputed litigation, that the court did not consider prior settlement negotiations, and that the court did not determine the possible range of settlement can be addressed together.  Using the old Learned Hand formula, even if implicitly,

20

the value of a law suit can be determined even without an
exhaustive discussion of all possible outcomes that BBL seems to
desire.  The $300,000.00 settlement offer allegedly made to BBL by
Talent Tree, is irrelevant to a settlement value consideration. The
previous settlement offer was allegedly made prior to certain
disclosures and prior to certain federal indictments. The prior
offer contained different terms than the settlement which was
ultimately proposed by Talent Tree and approved by the bankruptcy
judge.

The court can find no error in the bankruptcy court's full
consideration of all relevant factors in approving the plan.

### 3. § 548(a)(2): Fraudulent Transfer

BBL claims that even if there was an agreement to guarantee
the Talent Tree loan by Lofton and BBL, the guarantee constituted
a fraudulent transfer under 11 U.S.C. § 548(a).   Section 548(a)
provides:

> The trustee may avoid any transfer of an interest of the
> debtor in property, or any obligation incurred by the
> debtor, that was made or incurred on or within one year
> before the date of the filing of the petition, if the
> debtor voluntarily or involuntarily--

> ***

> (2)(a) received less than a reasonably equivalent value
> in exchange for such transfer or obligation; and

21

(B)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur debts that would be beyond the debtor's ability to pay as such debts matured.

Debtors do not contend that § 548(a)(2)(B)(ii) is implicated in the present case. Rather, debtors assert that the transfer was fraudulent under the other § 548(a)(2) provisions.

At the outset, this court notes the oddity of debtors' fraudulent conveyance argument under the present facts.

The [fraudulent conveyance] statute was aimed at a practice by which overburdened debtors placed their assets in friendly hands thereby frustrating creditor's attempts to satisfy their claims against the debtors. After the creditors had abandoned the effort to recover on their claims, the debtor would obtain a reconveyance of the property that had been transferred.   Such transactions operated as a fraud against the debtor's creditors because the debtor's estate was depleted without exchanging property of similar value from which the creditors claims could be satisfied.

*Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 544-45 (3d Cir. 1991), *cert. denied.* 503 U.S. 937, 112 S. Ct. 1476 (1992). Here, the so-called frustrated creditors whom the statute was designed to protect were all paid in full.   There was no

22

improper transfer of assets into "friendly hands." Rather it is BBL and Lofton who are balking about assets they placed in the "friendly hands" of Talent Tree, the only creditor not paid in full.  Apparently, good friends are hard to find. The statute allows the trustee, who advocates the interests of all creditors, to avoid the transfer. *See* 11 U.S.C. § 548(a).  Oddly, it is the debtors,[1] who the trustee is not supposed to coddle, who seek to avoid the transfer.  Because neither party addressed this issue, the court shall not digress further.

Debtors argue that they received less than reasonably equivalent value in exchange for their guarantee pursuant to § 548(a)(2)(a).  BBL contends that it had absolutely no interest in Hospital, to whom the loan was extended, and therefore the guarantee was a transaction solely for the benefit of the third party Hospital.  Normally, transfers solely for the benefit of third parties do not furnish fair consideration under § 548(a)(2)(a). *See, e.g., Klein v. Tabatchnick,* 610 F.2d 1043, 1047 (2d Cir. 1979)(interpreting 11 U.S.C. § 107(d)(2)(a) from which § 548(a)(2)(a) was largely derived); *Royal Crown Bottlers of Northern Ala., Inc. v. Falkner,* 23 B.R. 28 (Bankr. N.D. Ala. 1982).

---

[1]Debtors apparently may advance such claims. *See In re Pembroke Development Corp.,* 124 B.R. 398 (Bankr. S.D. Fla. 1991).

However, courts have recognized that

> an indirect benefit to the transferor may be sufficient
> to establish reasonably equivalent value where the debtor
> and the third party are so related or situated that they
> share an identity of interests because what benefits one
> will, in such case benefit the other to some degree.

*In re Pembroke Development Corp.*, 124 B.R. 398 (Bankr. S.D. Fla.
1991) (citing cases). BBL says it is a corporation whose primary
business is farming, and that it had absolutely no interest in the
success or failure of Hospital, even if Lofton did.

While this court recognizes and respects the fact that BBL
existed apart from Lofton, the bankruptcy court did, on substantial
evidence, find a connection. This court, from the virtually
undisputed facts agrees that such a relationship existed. BBL was
wholly owned by Lofton, who either directly or indirectly had a
substantial stake in Hospital's viability. His wife apparently
formed Hospital. She allegedly received an $300,000.00 per year
salary from Hospital. BBL had in the past made loans to Hospital,
albeit small ones, to ensure the hospital's continued success.
Lofton's consulting business was likely directly benefited from
Hospital's continued existence. Lofton's daughters were employed by
Hospital. BBL, Lofton, Barbara Lofton, and Hospital, as entities
and individuals are so intertwined that the bankruptcy court could
easily find, as it did, that a benefit for the third party Hospital

24

benefited both BBL and Lofton. The court notes that no further evidence is likely to be forthcoming on the issue of the relationship between BBL, Hospital and Lofton. Lofton refuses to testify about the relationship, Barbara Lofton has invoked her Fifth Amendment right not to answer questions about the relationship, and Lofton's daughters will not testify. The ultimate mystery of the precise interactions among the entities and individuals may never be known, but the bankruptcy case must be resolved and the creditors satisfied to the extent of the estate assets. To reiterate, this court finds no error in the bankruptcy court's determination that BBL and that Lofton shared an identity of interest with Hospital and Barbara Lofton during the time period that BBL and Lofton guaranteed Talent Trees' loans to Hospital.

Debtors complain also that they guaranteed roughly $1.5 million in Talent Tree loans of which approximately $1 million of debt existed prior to the guarantee. They argue that this proves, since post-guarantee Talent Tree forwarded Hospital only around $350,000.00, that the obligations debtors incurred were not equivalent to the money advanced by Talent Tree--that was used to pay employee salaries. This argument must fail. At the time of the transfer Hospital may have folded if it did not receive the additional money from Talent Tree to pay its employees. BBL and

25

Lofton benefited, through their relationship with Hospital, from Hospital's continued viability which was in terms of wages paid, consulting fees charged, etc., was worth substantially more than $350,000.00.

Next, debtors argue that Lofton intended to incur a debt that was beyond the ability of BBL to pay. The bankruptcy judge held that "Lofton believed that BBL could satisfy a repayment plan with Talent Tree if the Hospital failed." Indeed, this appears to be the case. As Talent Tree notes, BBL did not become insolvent at the time of loan, and as the loan became due, there is no indication in the record that Lofton did not believe the loan could be paid back, as it became due. Debtors point to nothing that would allow this court to reverse the bankruptcy judge's determination on this issue.

## 4.  The Cash Collateral Hearing

In the bankruptcy court's findings of facts, that court suggested that BBL "failed to bear its burden of proof on the joint fraud claims . . . ." BBL contends that this finding is clearly erroneous because counsel for BBL and Talent Tree stipulated that any determination at that hearing would not act as a *res judicata* bar on any other aspect of the case. The court is confused by this argument. The bankruptcy court, articulating this particular

finding of fact, made reference to BBL's failure to prove fraud only in the context of the cash collateral hearing. The probability of success of the fraud claim for purposes of approving the plan was discussed thoroughly by the bankruptcy judge in its conclusions of law. No where in discussing the fraud claim did the judge suggest that the determination at the cash collateral hearing in any way determined the outcome of the plan's approval.

### 5. Bad Faith

BBL contends that Talent Tree proposed the settlement and plan in bad faith and therefore that the plan should be set aside. The plan does propose a settlement of a suit against Talent Tree and said suit was determined to be reasonable by the bankruptcy court. This court naturally assumes that Talent Tree proposed a plan that would be in its best interest, but best interest does not equate with bad faith. Even if the plan was proposed for some ulterior motive, motivations are not relevant to a fairness determination. While BBL points to the advantages that the plan offers Talent Tree it in no way addressed any statutory or case law or factual grounds upon which this court could determine that the bankruptcy court's acceptance of the Talent Tree plan should be invalidated.

### 6. § 1129(a)(7)

BBL further alleges that the proposed plan fails to conform

27

with § 1129(a)(7).   That provision requires:

> With respect to each impaired class of claims or interests--
>
> (a) each holder of a claim or interest of such class--
>
>> (I) has accepted the plan; or
>>
>> (ii) will receive or retain under the plan or account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11  U.S.C.  §  1129(a)(7)(a).    The bankruptcy court, without explanation, found that these criteria had been met.  Apparently BBL's sole argument on this ground is that Talent Tree's claims against Lofton would not be allowed.   This argument has already been addressed. The probability of success on the merits of the fraud claim are next to zero.  Accordingly, Lofton, sole equity holder of BBL is getting what he would have received in a Chapter 7 bankruptcy.   BBL has not demonstrated that Lofton would have received any more in the a Chapter 7 liquidation than he would have received in a Chapter 11 reorganization.

### 7. Lofton's Objections

Lofton's objections, though unsupported by legal reasoning or case citation, are essentially those of BBL. A reiteration of them here is therefore not necessary.   Lofton's arguments primarily

28

concern the fact allegations surrounding the purported fraud by Don Harris and Talent Tree, and the inadequacy of consideration for the Hospital guarantee. He tries to distance himself and BBL factually from Barbra Lofton and Hospital, but the validity of these facts have been determined by the bankruptcy court in a way that does not constitute clear error. Lofton claims that other facts are not as the bankruptcy court found them, but again offers no convincing evidence that the bankruptcy court erred in its determination of these facts. Rather, Lofton attacks Talent Tree and Harris for alleged unethical and illegal acts.

Lofton's arguments differ from those of BBL only in a several respects. First, Lofton argues that the bankruptcy court erroneously prohibited Lofton from cross-examining a witness at a hearing. Lofton was later allowed, some two weeks later, to cross-examine the witness on a conference call with all parties. Lofton objected to this procedure claiming that not allowing immediate cross-examination prejudiced his position. While it may be have been an inconvenience, the mistake, if there was one, was corrected. Lofton has shown no "prejudice" on this point that would require this court to reverse the bankruptcy court's decision.

Second, Lofton alleges racial bias by Talent Tree and the bankruptcy court. Talent Tree's lawyers' or officers' biases, if

they exist, are irrelevant to the validity of the bankruptcy court's determination. However, suggesting that a federal bankruptcy judge would have decided issues in the case differently if Lofton had been white, without even an iota of evidence, is extremely disturbing to this court. Lofton is admonished that such allegations are extremely serious and should not be advanced when there is no evidence to support them. Finally, Lofton pleads that his situation is desperate and that the bankruptcy as structured will, if it has not already, ruin him. While Lofton's situation is in some sense tragic, the court is bound to follow the law.

### 8. Conclusion

BBL's and Lofton's objections to the plan are without merit. This court finds no clear error of fact nor any error of law in the bankruptcy court's approval of the plan. The judgement of the bankruptcy court is therefore due to be affirmed. While this court probably would have allowed the adversary proceedings to commence before making a final determination on the confirmation of the Chapter 11 plan if it had been the bankruptcy court, the bankruptcy judge is not bound to do so. The bankruptcy court made a valuation of the suit as an asset for distribution in the bankruptcy. Final adjudication of the merits is not required. The resolution of the adversary proceedings would have been advantageous, especially

30

since the primary debt in the bankruptcy proceedings is money owed to Talent Tree from the allegedly fraudulent guarantees.  The court laments the fact that Congress was not more specific in the language of their statute with regard to "settlements" so as to require a meeting of the minds on the adversary proceedings before they can be submitted as part of a proposed plan.  The rationale behind not doing so may be the fact that recalcitrant debtors would never agree to a settlement, especially in cases like the present one, and that this in turn would delay bankruptcy proceedings too long on tenuous claims.  Whatever the reason, the law is the law, and it was correctly applied in the present case.

The bankruptcy court's decision will be affirmed. A separate and appropriate order will be entered.

DONE this _____ day of February, 1997.

_____

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT COURT